UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

UNITED STATES OF AMERICA,

        Plaintiff,

  v.

ALBERTO FERNANDO MANFREDI,

        Defendant.

NO. CIV. S 06-416 FCD

MEMORANDUM AND ORDER

----oo0oo----

This matter is before the court on defendant Alberto Manfredi's ("Manfredi") motion for attorney's fees, pursuant to the Hyde Amendment, Pub. L. No. 105-109, § 617, 111 Stat. 2519 (1997) (codified at Historical and Statutory Notes to 15 U.S.C. § 3006A), arising out of a criminal prosecution for making false statements in bankruptcy petitions and a loan application.[1]  For the reasons set forth below, defendant's motion is DENIED.

/////

/////

---

    [1]  Because oral argument will not be of material assistance, the court orders these matters submitted on the briefs.  E.D. Cal. L.R. 78-230(h).

1

**BACKGROUND**

**A.   Bankruptcy Petitions**

On November 30, 2004, Manfredi contacted bankruptcy attorney Peter Macaluso ("Macaluso"). (Decl. of Peter Macaluso ("Macaluso Decl."), filed Dec. 13, 2007, ¶ 3.)  Facing a writ of attachment, Manfredi and Macaluso prepared a Chapter 13 bankruptcy petition. (Macaluso Decl. ¶¶ 3-5.)  The petition was filed the following day on December 1, 2004.  (Macaluso Decl. ¶ 5.)

On December 22, 2004, the Chapter 13 trustee assigned to Manfredi's case, Lawrence Loheit ("Loheit"), conducted a "business examination" with Manfredi and Macaluso.  (Macaluso Decl. ¶ 6.)  At this meeting, Manfredi provided Loheit with bank records for Manfredi's company, Sempter Fi, Inc., for June, July, August, and October of 2004.  (Macaluso Decl. ¶ 6.)  A copy of Manfredi's personal bank account statement for November 2004 was also provided.  (Macaluso Decl. ¶ 6.)

On December 30, 2004, Manfredi and Macaluso attended a meeting of creditors[2] with Loheit's attorney, Neil Enmark ("Enmark").  (Tr. Meeting of Creditors, Ex. 2 to Decl. of Philip H. Stillman ("Stillman Decl."), filed Dec. 13, 2007, ("Tr. Dec. 30 Creditor's Meeting").)  The meeting was continued to and concluded on January 27, 2005.  (Tr. Meeting of Creditors, Ex. 3 to Stillman Decl., filed Dec. 13, 2007 ("Tr. Jan. 27 Creditor's Meeting").)

---

[2]   Under a Chapter 13 bankruptcy, debtors must propose a payment plan to make installments to creditors over a period of three to five years.  11 U.S.C. §§ 1321-1322.  Creditors meetings provide an opportunity for the creditors and bankruptcy trustee to examine the debtor.  11 U.S.C. §§ 341, 343.

1   On February 8, 2005, Loheit filed objections to Manfredi's

2   proposed Chapter 13 plan.  (Macaluso Decl. ¶ 13.)  Manfredi

3   subsequently filed an amended plan on March 13, 2005.  (Macaluso

4   Decl. ¶ 13.)  On April 18, 2005, Loheit objected to the amended

5   proposed plan, asking the bankruptcy court to either dismiss the

6   case or convert the proceedings to a Chapter 7 bankruptcy.

7   (Macaluso Decl. ¶ 14.)

8       The bankruptcy court sustained Loheit's objections and

9   denied confirmation of Manfredi's plan on May 3, 2005.  (Macaluso

10  Decl. ¶ 15.)  Manfredi moved to dismiss the case on May 10, 2005.

11  (Macaluso Decl. ¶ 15.)  The court granted the motion that same

12  day.  (Macaluso Decl. ¶ 15.)

13      On May 23, 2005, Macaluso prepared a new Chapter 13 petition

14  for Manfredi based on information gathered since the filing of

15  the first petition.  (Macaluso Decl. ¶ 16.)  A meeting of

16  creditors was held on June 30, 2005.  (Tr. Meeting of Creditors,

17  Ex. 4 to Stillman Decl., filed Dec. 13, 2007 ("Tr. June 30

18  Creditor's Meeting").)  The bankruptcy court approved Manfredi's

19  new proposed Chapter 13 plan on January 23, 2006.  (Macaluso

20  Decl. ¶ 17.)

21  **B.    <u>Indictment</u>**

22      On October 12, 2006, the government indicted Manfredi on two

23  counts of making false statements in a bankruptcy case and one

24  count of making a false statement on a loan application.

25  Manfredi alleges he voluntarily disclosed/corrected these alleged

26  false statements during his meetings with creditors.  (Macaluso

27  Decl. ¶¶ 6-11.)

28  /////

**1.   Count 1: 2004 Bankruptcy Petition**

The first count of the indictment alleged several false statements in Manfredi's 2004 bankruptcy petition. (Indictment ("Ind."), filed Oct. 12, 2006, at 3:26-5:10.)  First, the government alleged Manfredi misrepresented his monthly income as $6,000. (Ind. at 3:26-28.)  The government based its allegations on the following facts:

- Manfredi stated in his November 1, 2004, application for a home refinance loan that his monthly income was $8,000. (Residential Loan App., Ex. A to Kurt A. Didier Decl. ("Dedier Decl."), filed Feb. 19, 2008, at 2.)

- Manfredi stated in his 2004 bankruptcy petition that the gross income from his business for the previous year was $20,000, or $1,667 per month. (2004 Bankr. Pet., Ex. A to Didier Decl., filed Feb. 19, 2008, ("2004 Bankr. Pet.") at 17.)  Manfredi also stated in the petition he had no other income apart from business income. (2004 Bankr. Pet. at 18.)

- Manfredi stated in his 2004 bankruptcy petition that the combined balance of his bank accounts was $150. (2004 Bankr. Pet. at 5.)

- Manfredi's amended 2004 bankruptcy petition disclosed personal loans totaling $133,000 from family members. (2004 Am. Bankr. Pet., Ex. A to Didier Decl, filed Feb. 19, 2008, at 2-3.)  In his 2005 bankruptcy petition, Manfredi increased this disclosure to $173,000. (2005 Bankr. Pet., Ex. A to Didier Decl, filed Feb. 19, 2008, ("2005 Bankr. Pet.") at 11-13.)  Manfredi stated at the June 30, 2005,

creditor's meeting that these loans were for personal living expenses.  (Tr. June 30 Creditor's Meeting at 16:21-17:5.)

Second, the government alleged Manfredi incorrectly reported his only source of income as his business.  (Ind. at 4:1-8.)  In his 2005 bankruptcy petition, however, Manfredi reported monthly income of $1,750 from employment and $3,350 from family assistance.  (2005 Bankr. Pet. at 17.)  The petition did not clarify whether the assistance was a loan.  (2005 Bankr. Pet. at 17.)

Third, the government alleged Manfredi failed to disclose a $25,000 transfer to his father.  (Ind. at 4:9-16.)  Manfredi stated in the 2004 bankruptcy petition that he paid his father $5,000 in the previous year.  (2004 Bankr. Pet. at 18.)

Fourth, the government contended Manfredi falsely reported he had not made any transfers outside the ordinary course of business on his 2004 bankruptcy petition.  (Ind. at 4:17-26.) Manfredi disclosed during the December 30, 2004, creditor's meeting that he sold an Amada Press[3] for about $20,000.  (Tr. Dec. 30 Creditor's Meeting at 7: 5-7.)  Manfredi produced a bill of sale for the machine that reflects a sale price of $39,000. (Invoice, Ex. A to Didier Decl., filed Feb. 19, 2008 ("Invoice").)

Fifth, the government alleged Manfredi failed to disclose his interest in other business entities.  (4:27-5:10.)  The petition disclosed interests in Semper Fi, Inc. and EGA Engineering.  (2004 Bankr. Pet. at 7.)  Manfredi briefly owned an

---

[3]   An Amada Punch Press is used in sheet metal operations to stamp, punch, bend, and shear sheet metal, for example.

interest in Latitude Technologies from 1998 to 1999.  (Dec. 30
Creditor's Meeting at 23:4-7.)

### 2.   Count 2: 2005 Bankruptcy Petition

The second count of the indictment alleged two false
statements in Manfredi's 2005 bankruptcy petition.  (Ind. at
5:26-6:18.)  First, the government alleged Manfredi failed to
report the repossession of his vehicle in the interim between
filing the 2004 bankruptcy petition and filing the 2005
bankruptcy petition.  (Ind. at 5:26-6:4.)  Travis Credit Union
repossessed Manfredi's vehicle after the dismissal of the 2004
bankruptcy petition, but returned the vehicle once Manfredi filed
the 2005 bankruptcy petition.  (Trial Tr. for Nov. 6, 2007, filed
Nov. 13, 2007, ("Nov. 6 Trial Tr.") at 71:14-24.)

Second, the government contended Manfredi falsely reported
the value of the Amada Press as $20,000 on his 2005 bankruptcy
petition.  (Ind. at 6:6-18.)  The bill of sale Manfredi produced
for the machine reflected a sale price of $39,000.  (Invoice.)

### 3.   Count 3: Car Loan Application

The third count of the indictment was based upon Manfredi's
alleged misrepresentation to Travis Credit Union on his vehicle
loan application of monthly income totaling $8,000.  (Ind. at
7:1-6.)  Manfredi reported monthly income of $6,000 on his 2004
bankruptcy petition.  (2004 Bankr. Pet. at 14.)

## C.   Alleged Incidents of Harassment

Assistant United States Attorney ("AUSA"), Ellen Endrizzi
("Endrizzi"), was assigned to prosecute the Manfredi case.
Endrizzi allegedly made four attempts to contact Macaluso before
trial.  (Macaluso Decl. ¶ 31.)  The first attempt was a telephone

call.  (Macaluso Decl. ¶ 31.)  Macaluso answered the call and

told Endrizzi she was mistaken about her claims.  (Macaluso Decl.

¶ 31.)  Endrizzi attempted a second call, which Macaluso refused

to answer.  (Macaluso Decl. ¶ 32.)  Endrizzi called once more,

leaving the following voice message:

> This is regarding the Manfredi trial, but it also has
> to do with whether Mr. Macaluso consulted an attorney
> before he chose--he's choosing to testify. A) I'm
> concerned he's opening himself up to possible criminal
> charges, but B) on the other vein, opening himself up
> to a major civil lawsuit either by Mr. Manfredi himself
> or as additional proof under oath for the issues he's
> got with Mr. Healy.  So, those are some things I'd like
> to talk to him about.

(Macaluso Decl. ¶ 35.)  Macaluso did not return Endrizzi's phone

call.  (Macaluso Decl. ¶ 37.)

Accompanied by an FBI agent, Endrizzi subsequently appeared

at an unrelated meeting of creditors Macaluso was attending with

clients.  (Macaluso Decl. ¶ 37.)  Endrizzi attempted to interview

Macaluso, but he refused to say anything except that Manfredi was

innocent.  (Macaluso Decl. ¶ 37.)

Endrizzi also subpoened copies of Manfredi's Standard Form

86: Questionnaire for National Security Positions ("SF-86") to

compare against his bankruptcy statements.[4]  (Decl. of Ellen V.

Endrizzi, Ex. D to Didier Decl., filed Feb. 19, 2008, ("Endrizzi

Decl.") ¶ 76.)  Endrizzi contacted several government agencies to

obtain copies of these forms.  (Endrizzi Decl. ¶ 76.)  Manfredi's

security clearance was thereafter revoked.  (Decl. of Alberto

Fernando Manfredi, filed Dec. 13, 2007, ¶ 4.)

/////

---

[4]   SF-86 forms are sworn statements required to obtain
security clearance.  (Endrizzi Decl. ¶ 77.)

1 **D.   Dismissal of Indictment**

2       Jury trial began in this matter on November 5, 2007.  During

3 its case in chief, the government determined, based on newly

4 discovered evidence, that a dismissal would best serve the

5 interests of justice.  (Trial Tr. for Nov. 13, 2007, filed Jan.

6 8, 2008, ("November 13 Trial Tr.") at 1:16-18.)  The court

7 granted the government's motion to dismiss on November 13, 2007.

8 (Nov. 13 Trial Tr. at 2:18-19.)  Manfredi now moves for

9 attorney's fees under the Hyde Amendment.

10                          **STANDARD**

11       Congress enacted the Hyde Amendment to sanction the

12 government for prosecutorial misconduct.  <u>United States v.</u>

13 <u>Manchester Farming P'ship</u>, 315 F.3d 1176, 1182 (9th Cir. 2003)

14 (citations ommitted).  It provides in relevant part:

15           [T]he court, in any criminal case . . . may award to a
             prevailing party, other than the United States, a
16           reasonable attorney's fee and other litigation
             expenses, where the court finds that the position of
17           the United States was vexatious, frivolous, or in bad
             faith, unless pursuant to procedures and limitations
18           (but not the burden of proof) provided for an award
             under section 2412 of title 28, United States Code.
19

20 Pub. L. No. 105-109, § 617, 111 Stat. 2519 (1997) (codified at

21 Historical and Statutory Notes to 18 U.S.C. § 3006A).

22       Although modeled after the Equal Access to Justice Act

23 ("EAJA'), the Hyde Amendment requires a more demanding burden of

24 proof.  <u>Manchester Farming P'ship</u>, 315 F.3d at 1182 (citations

25 ommitted).  Under the EAJA, a defendant will prevail unless the

26 government can prove substantial justification for its case.  <u>Id</u>.

27 Under the Hyde Amendment, however, the burden is on the defendant

28 to show the government's case was vexatious, frivolous, or in bad

                                  8

1  faith.  Id.

2      The Hyde Amendment does not define "frivolous," "vexatious,"

3  or "bad faith"; however, the Ninth Circuit has developed

4  definitions for each of these terms.  A case is frivolous when

5  "foreclosed by binding precedent or so obviously wrong as to be

6  frivolous."  Id. at 1183.  "Vexatious" refers to (1) a subjective

7  malice or intent to harass on the part of the government and (2)

8  an objectively deficient or meritless case.  Id. at 1182.

9  Finally, "bad faith" is defined as "not simply bad judgement or

10  negligence, but rather . . . conscious doing of a wrong because

11  of dishonest purpose or moral obliquity."  Id. at 1185.

12                              **ANALYSIS**

13  **A.   Frivolous**

14      In order to convict a defendant of bankruptcy fraud, the

15  government must prove (1) the existence of bankruptcy

16  proceedings; (2) that a statement under penalty of perjury was

17  made therein; (3) that the statement was made as to a material

18  fact; (4) that the statement was false; and (5) that the

19  statement was knowingly and fraudulently made.  United States v.

20  Lindholm, 24 F.3d 1078, 1082-83 (9th Cir. 1994).  Manfredi argues

21  the government's case was frivolous because none of the alleged

22  statements were material, false, or fraudulent.  Each of these

23  arguments will be addressed in turn.

24      **1.   Material**

25      A statement is considered material if it relates to (1) the

26  extent and nature of the bankrupt's assets; (2) the bankrupt's

27  business transactions or estate; (3) the discovery of assets; (4)

28  the history of a bankrupt's financial transactions; or (5)

                                  9

statements designed to secure adjudication by a particular

bankruptcy court.  <u>Lindholm</u>, 24 F.3d at 1083.  Manfredi argues

the government failed to present any evidence that any of the

allegedly false statements were material.  However, the

materiality of a false statement is a question of law, not fact.

<u>Id.</u>  Thus, the government was not required to present evidence on

the issue of materiality.

Moreover, the allegedly false statements were material as a

matter of law.  Incorrect statements regarding a bankrupt's

income, assets, and debts impedes investigation into the debtor's

financial affairs.  <u>See id.</u> at 1084 ("[F]ailure to disclose prior

bankruptcies could impede an investigation into a debtor's

financial affairs . . . .");  <u>United States v. Phillips</u>, 606 F.2d

884, 887 (9th Cir. 1979) (holding that understatement of assets,

fabrication of social security number and address, and omission

of past names could impede investigation into debtor's financial

history and mislead creditors as to debtor's identity).  Such

statements also cause the debtor to appear financially stronger

than he is and impact the effectiveness of the Chapter 13

repayment plan.  <u>Cf.</u> <u>United States v. Strauch</u>, 1995 WL 377192, at

*7 (9th Cir. June 23, 1995).  The court thus concludes the

allegedly false statements in the 2004 and 2005 bankruptcy

petitions, as well as the vehicle loan application, were

material.  The court therefore rejects Manfredi's argument that

the government's case was frivolous because the alleged

statements were immaterial.

/////

/////

10

**2.  False**

Manfredi next argues that none of the alleged statements were false.  First, Manfredi argues his voluntary disclosure/correction of the false statements during his creditor's meetings absolve any falsity in the bankruptcy petitions.  However, none of the cases cited by Manfredi hold that disclosure of false statements negates their falsity.  In re Adeeb, 787 F.2d 1339, 1345 (9th Cir. 1986); In re Waddle, 29 B.R. 100, 103 (W.D. Ky. 1983).[5]  The court also rejects Manfredi's suggestion that the crime of making false statements in a bankruptcy petition occurs upon failure to disclose these statements at the first creditor's meeting.  The crime of false statement in a bankruptcy proceeding is complete upon the filing of the petition or other document in a proceeding under Title 11.  18 U.S.C. section 152(3) provides that "[a] person who . . . knowingly and fraudulently makes a false declaration, certificate, verification, or statement under penalty of perjury . . . in or in relation to any case under title 11 . . . shall be fined under this title, imprisoned nor more than 5 years, or both."  The court therefore is not persuaded the statements in Manfredi's bankruptcy petitions were not false because they were later disclosed/corrected.

Manfredi next argues the government failed to produce any evidence showing Manfredi's statements were false.  This assertion is contradicted by the evidence forming the basis of

---

[5]     While these courts may have made such statements in dicta, the issue was not before the courts.  Moreover, such dicta is contrary to the plain reading of the statute at issue.

the indictment and the representations made by Manfredi himself.
The government noted numerous discrepancies between statements
made in Manfredi's bankruptcy petitions, loan applications, and
meetings with creditors.  For example, Manfredi's 2004 home
refinance loan application listed a monthly income of $8,000,
whereas his 2004 bankruptcy petition listed a $6,000 monthly
income; Manfredi listed a transfer to his father as $5,000 on his
2004 bankruptcy petition, when the transfer totaled $25,000; and
the price of the Amada Press listed on Manfredi's 2005 bankruptcy
petition was $20,000, while the bill of sale for the machine
reflected a sale price of $39,000.  Indeed, in his trial brief,
Manfredi represented to the court that "[t]he only real issue [in
this case] is whether the alleged false statements were
fraudulently made or merely incorrect [sic]."  (Def.'s Trial
Brief, filed Oct. 23, 2007, at 2:2-3.)  The court therefore
concludes Manfredi has not met his burden of showing the
government's case was frivolous due to insufficient evidence.

    Finally, Manfredi contends that count three of the
indictment was groundless because Travis Credit Union wrongfully
repossessed his vehicle.  The testimony of Janet Prosser
("Prosser"), a Travis Credit Union employee, refutes Manfredi's
assertion.  Prosser testified at trial that payments on the
vehicle were overdue, Manfredi received notice of the credit
union's intent to repossess, and the credit union repossessed the
vehicle.  (Nov. 6 Trial Tr. at 49:6-51:7.)  Although Prosser
testified the vehicle was subsequently returned, she indicated
this resulted from the filing of the 2005 bankruptcy petition,
which afforded Manfredi protection against repossession.  (Nov. 6

Trial Tr. at 71:5-22.)   The evidence presented at trial thus
demonstrated that the vehicle was lawfully repossessed during the
two week period between the dismissal of the 2004 bankruptcy
petition and the filing of the 2005 bankruptcy petition.
Accordingly, Manfredi cannot establish that count three was
frivolous.

####    3.    Fraudulent Intent

Manfredi contends the government failed to produce any
evidence he made the false statements with fraudulent intent.
However, the government did have evidence from which a reasonable
inference of such intent could be drawn.   There is no requirement
that fraudulent intent be proved through direct evidence.   United
States v. Lindberg, 220 F.3d 1120, 1125 (9th Cir. 2000).   The
inconsistencies in Manfredi's monthly income, sale of the Amada
Press, and vehicle repossession, among others, could lead a jury
to conclude Manfredi was intentionally hiding assets.

Manfredi argues that it was impossible for the government to
prove he acted with intent because he voluntarily
disclosed/corrected many, if not all, of the inconsistencies in
his petitions and loan applications.   Manfredi appears to rely on
In re Adeeb and In re Waddle for support.   These cases, however,
do not support Manfredi's position.   The court in In re Adeeb
considered whether a debtor who transfers property within a year
of bankruptcy with the intent to defraud a creditor may be denied
a discharge in bankruptcy even if he reveals the transfers to his
creditors and recovers all the property before he files his
bankruptcy petition.   787 F.2d at 1343-44.   Interpreting the word
"transferred" in section 727 of the bankruptcy code to mean the

13

property is not in the possession of the debtor at the time of filing a bankruptcy petition, the court held a debtor is entitled to a discharge in bankruptcy despite a fraudulent transfer within the preceding year if he reveals the transaction to his creditors and recovers substantially all the property *prior to* filing for bankruptcy.  Id. at 1345.  In re Adeeb therefore did not address whether a debtor that makes false statements in a bankruptcy petition can still be held liable if he corrects those statements *after* the petition is filed, at the first meeting of creditors.

Similarly, In re Waddle considered whether a debtor who transfers property within a year of bankruptcy to the benefit of secured creditors may be discharged in bankruptcy.  29 B.R. at 104.  The court held that a debtor who makes a preferential transfer to secured creditors is entitled to a discharge, although the bankruptcy trustee may bring an action challenging the preferential transfer on behalf of the unsecured creditors.  Id.  No such preferential transfer was made in this case.  Thus, neither In re Adeeb nor In re Waddle preclude a jury from finding Manfredi acted fraudulently where he voluntary disclosed or corrected false statements in the bankruptcy petitions.

Moreover, Manfredi's allegedly voluntary disclosures place in dispute whether Manfredi acted innocently.  A jury could disregard these voluntary admissions as realizations that exposure of the truth was inevitable and as an attempt to avoid subsequent criminal prosecution.  Thus, Manfredi cannot establish the government's case for fraud was utterly groundless.

Similarly, Manfredi argues that each of the alleged false statements can be explained/refutted, precluding a finding of

14

fraudulent intent.  For example, Manfredi claims the listing of a $5,000 payment to his father instead of a $25,000 payment was a typographical error, the failure to list monetary assistance from his family was because they were loans, and failure to list the Amada Press resulted from a mistaken belief the machine was sold more than a year prior to the filing of the bankruptcy petition. While Manfredi may have plausible explanations for each individual statement, these statements taken as a whole could sustain a finding of fraudulent intent.  A jury may be willing to accept one or even a few mistakes, but numerous inconsistencies among and within documents could lead a jury to conclude Manfredi was being deceitful.  Thus, Manfredi cannot show the government's case was frivolous by providing explanations for each individual statement.

Manfredi also alleges that an intent to defraud cannot be shown because his creditors were eventually paid in full. However, the crime of false statement in a bankruptcy proceeding does not require the successful defrauding of creditors.  See Lindholm, 24 F.3d at 1082-83 (listing elements); cf. United States v. DeSantis, 237 F.3d 607, 613 (6th Cir. 2001) ("Success of the scheme is not an element of the crime.").  Therefore, the fact Manfredi did not defraud his creditor's does not negate any potential intent to defraud at the time the statements were made.

Finally, Manfredi contends that counts one and two, specifically, were frivolous because he relied on the advice of counsel in filling out the bankruptcy petitions.  Although a bankrupt's reliance upon the advice of counsel generally rebuts an inference of fraud, counsel must be fully aware of all the

relevant facts in order for reliance to be justified.  See In re
Retz, 364 B.R. 742, 758 (D. Mont. 2007) ("[I]f items were
ommitted by mistake or upon honest advice of counsel, *to whom the*
*debtor had disclosed all the relevant facts*, the declaration will
not be deemed willfully false[.]") (emphasis added).  Manfredi
has not established Macaluso advised him to make the false
statements in his bankruptcy petition or that he provided
Macaluso all relevant facts upon which to base such advise.  At
least with respect to the 2004 bankruptcy petition, Manfredi and
Macaluso represent to the court that the statements were made in
haste to avoid a writ of attachment and that Manfredi did not
have much documentation with him the day they completed the
petition.  (Macaluso Decl. ¶¶ 3-4.)  Absent evidence establishing
the disclosures Manfredi made to Macaluso and the advice Macaluso
rendered with respect to filing the petitions, the court cannot
conclude Manfredi was entitled to the defense of reliance on
counsel.

The court re-emphasizes that Manfredi has the heavy burden
of establishing the government's case was foreclosed by binding
precedent or so obviously groundless as to be frivolous.
Manchester Farming P'ship, 315 F.3d at 1183.  Although the
strength of the government's case may have been assessed
differently if a seasoned prosecutor had been the lead attorney,
the evidence in the record was sufficient to initially sustain
prosecution.  See id. at 1183-84 (holding government's
prosecution for unlawful receipt of farming subsidies was not
frivolous even though no regulatory violation occurred and
government continued to make payments during prosecution).  At

their core, Manfredi's arguments appear premised on the dismissal
of the indictment.  However, "[t]o say in hindsight that a case
could not be proved beyond a reasonable doubt is hardly the same
as showing that the case was unfounded and intended to harass."
United States v. Sherburne, 249 F.3d 1121, 1127 (9th Cir. 2001).
The court therefore declines to award attorney's fees on the
basis that the case was frivolous.

**B.   Vexatious**

        Manfredi also alleges the government's case was vexatious.
First, Manfredi argues the case is entirely meritless as set
forth in his argument the case was frivolous.  For the reasons
set forth above, however, the case was not objectively without
merit.

        Second, Manfredi argues there is strong evidence of an
intent to harass on the part of the government.  Specifically,
Manfredi argues the government's claims were not factually or
legally tenable.  Manfredi also contends the government's
subjective intent to harass is shown by the voice message
Macaluso received from Endrizzi, Endrizzi's unexpected appearance
with a FBI agent at an unrelated creditor's meeting to interview
Macaluso, and Endrizzi's alleged attempts to remove Manfredi's
security clearance.

        "[S]ubjective intent to harass does not arise from merely
factual mistakes or mistakes concerning the legal merit of the
government's position.  United States v. Sherburne, 506 F.3d
1187, 1190 (9th Cir. 2007) (citing United States v. Schneider,
395 F.3d 78, 89-90 (2d Cir. 2005); United States v. Knott, 256
F.3d 20, 31 (1st Cir. 2001)).  Rather, intent to harass must be

shown with respect to the prosecution of the criminal case.   In

United States v. Knott, the government initiated criminal

proceedings against a corporation and its principal owner for

violations of the Clean Water Act.  256 F.3d at 22.  After the

government's dismissal of the charges, the defendants moved for

attorney's fees under the Hyde Amendment for vexatious

prosecution.  Id.  As evidence of the government's intent to

harass, the defendants alleged, *inter alia*, (1) the government

obtained water samples in violation of the Fourth Amendment; (2)

some of the recorded entries for the water samples had been

altered while in the government's possession; (3) the government

failed to automatically produce exculpatory evidence; and (4) the

government brought a "virtual SWAT team" to execute a search

warrant at the defendants' plant.  Id. at 31-33.  The court noted

the evidence "either lack[ed] sufficient record support or

fail[ed] to rise to the level of conduct required to find

vexatiousness."  Id. at 31.  The court concluded, however, that

even crediting all of the defendants' allegations, "[t]he record

simply [did] not reflect the sort of malice or prosecutorial

misconduct toward which the Hyde Amendment was directed."  Id. at

33.  The court reasoned:

> While the government might have handled itself better
> in some of these instances, that does not render its
> conduct "vexatious."  Rather, an award of fees for
> "vexatious" prosecution under the Hyde Amendment
> requires some evidence upon which a reasonable observer
> can conclude that *the prosecution was based in malice
> or an intent to harass* or annoy."

Id. at 33-34 (emphasis added).

    In this case, the court concludes the prosecution's conduct

does not exhibit the kind of malice or misconduct giving rise to

vexatious prosecution.  First, there is evidence in the record to refute an intent to harass on the part of the government.  As to Endrizzi's voice message, Endrizzi claims to have made the call to verify Macaluso was aware of the potential consequences of his testimony.  (Endrizzi Decl. ¶ 63.)  At the time, Macaluso was being sued by a former client, Kevin Healy, for malpractice.  (Endrizzi Decl. ¶ 63.)  Testimony that Macaluso was responsible for the false statements in Manfredi's bankruptcy petitions could have subjected Macaluso to suit by Manfredi, and such conduct could be admissible in the pending malpractice suit.  (Endrizzi Decl. ¶ 63.)  Endrizzi claims the reference to criminal liability in the voice message was to warn of potential liability if Macaluso helped Manfredi commit bankruptcy fraud.  (Endrizzi Decl. ¶ 63.)  This message may exhibit questionable judgment, but, in light of the above, it does not appear to be a threat by the government to prosecute.

A less nefarious explanation also exists for Endrizzi's unannounced appearance at the creditor's meeting.  Endrizzi claims that appearance occurred the same day as the voice message.  (Endrizzi Decl. ¶¶ 65-67 .)  Endrizzi alleges she decided to meet with Macaluso in person to pursue the matter and that during that meeting she expressly told Macaluso she did not intend her voice message to be threatening.  (Endrizzi Decl. ¶ 67.)  Cast in this light, Endrizzi's mere appearance at the creditor's meeting does not evince an ill intent of the government.

Finally, Endrizzi contacted agencies about Manfredi's security clearance to collect evidence.  Specifically, Endrizzi

sought to obtain copies of Manfredi's SF-86 forms. (Endrizzi Decl. ¶ 76.) Endrizzi subpoened these forms to compare against his sworn bankruptcy statements and verify the self-reported three bankruptcy petitions. (Endrizzi Decl. ¶ 77.) Although Endrizzi's contact with various government agencies possibly contributed to the revocation of Manfredi's security clearance, her motive for contacting these agencies was to obtain relevant information.

Manfredi argues that Endrizzi "gloated" about having his security clearance revoked. Endrizzi claims she commented that Manfredi would probably lose his security clearance, not as a result of her contacts with these agencies but because of Manfredi's poor financial situation. (Endrizzi Decl. ¶¶ 84-85.) According to Endrizzi, individuals with financial difficulties are not suitable for security clearance because of the potential for bribery or undue influence. (Endrizzi Decl. ¶ 85.) Whether Endrizzi's comment can be considered gloating or not, this fact does not establish a malicious intent on the part of the government.

However, assuming Manfredi's allegations are true, and Endrizzi's conduct was motivated by an intent to harass, the conduct independently and collectively does not demonstrate an intent to harass in bringing or pursuing the prosecution itself. See Knott, 256 F.3d at 31-33 (holding that water samples obtained in violation of Fourth Amendment, alteration of evidence while in government's possession, failure to automatically produce exculpatory evidence, and execution of search warrant by "virtual swat team" did not rise to level of vexatiousness). Endrizzi met

with Assistant United States Trustee, Antonia Darling
("Darling"), on two occasions prior to filing the indictment to
discuss the necessary elements of a bankruptcy fraud prosecution.
(Endrizzi Decl. ¶ 3.)  As part of the pre-indictment protocol,
Endrizzi also drafted a prosecution memorandum and draft
indictment for evaluation by Darling, AUSA Laura Ferris
("Ferris"), and AUSA John Vincent ("Vincent").  (Endrizzi Decl. ¶
5.)  There is no evidence that Darling, Ferris, or Vincent had or
demonstrated an intent to harass Manfredi through this
prosecution.  As such, the undisputed evidence regarding the
preliminary investigation demonstrates that the initiation of the
criminal prosecution was premised not upon an intent to harass,
but upon the merits of the case and under the advice of Darling,
Ferris, and Vincent.[6]

Moreover, Endrizzi's subsequent conduct, while disturbing,
does not evince an intent to harass Manfredi in continuing the
prosecution.  If anything, Endrizzi's conduct reflects an intent
to harass Macaluso, not Manfredi.  If the government had filed
criminal charges against Macaluso, a persuasive case for
vexatious prosecution might exist, given Endrizzi's voice message
and unexplained appearance at an unrelated client's creditor's
meeting.  Here, however, the only conduct directed at Manfredi
was the alleged attempts to revoke his security clearance.  This
isolated conduct cannot establish the entire prosecution was
pursued with an intent to harass.

---

[6] Based on the testimony produced at trial, the court is
particularly troubled by the quality of the investigation
performed by AUST Darling prior to the referral for prosecution.

1    In sum, defendant has not presented sufficient evidence to

2   establish the government prosecuted him vexatiously.   Although

3   the court recognizes the government's performance in pursuing the

4   case fell below desirable standards, the court cannot say the

5   government's conduct rose to the level of vexatiousness.   See

6   Manchester Farming P'ship, 315 F.3d at 1183 (holding government's

7   deliberate indifference in pursuing criminal charges insufficient

8   to establish vexatious prosecution); Knott, 256 F.3d at 33-34

9   (holding government's poor conduct did not render its case

10  vexatious).   The court therefore declines to awards attorney's

11  fees on this basis.

12  **C.   <u>Bad Faith</u>**

13   Manfredi argues the government acted in bad faith because

14  Endrizzi failed to conform her conduct to that of a reasonable

15  prosecutor.   However, the Ninth Circuit test for bad faith does

16  not involve an inquiry into the objective reasonableness of the

17  government's conduct.   See Manchester Farming P'ship, 315 F.3d at

18  1185; see also Sherburne, 249 F.3d at 1127 (rejecting a

19  "reasonable prosecutor" test for vexatious prosecution).   Rather,

20  the test for bad faith is whether the government had a subjective

21  dishonest purpose or moral obliquity.   Manchester Framing P'ship,

22  315 F.3d at 1185.   Mere bad judgment or negligence is not enough

23  to prove bad faith.   Id.

24   Manfredi argues the government prosecuted him in bad faith

25  because it knowingly presented false testimony of FBI agent Lee

26  Witkowski ("Witkowski").   Witkowski testified that Manfredi was

27  making substantially less than the $6,000 a month indicated on

28  the 2004 bankruptcy petition.   (Tr. of Grand Jury Proceedings,

22

Ex. 2 to Stillman Decl., filed Dec. 14, 2007, at 6:15-25.)
Manfredi urges that if Witkowski had reviewed his 2004 tax
return, along with his accounts receivable, he would have
discovered Manfredi's income was over $8,000 per month.[7]
However, the government denies receiving a copy of Manfredi's
2004 tax return during discovery.  (Endrizzi Decl. at 13:11-13.)
Moreover, the 2004 tax return has not been audited to verify its
veracity.

Assuming the tax return accurately reflects Manfredi's
monthly income, it highlights the inaccuracies in Manfredi's
statements in other documents.  For example, the 2004 bankruptcy
petition listed his monthly income as $6,000.  (2004 Bankr. Pet.
at 14.)  That same petition listed Manfredi's gross income for
the year as $20,000, or $1,667 per month.  (2004 Bankr. Pet. at
17.)  In his 2005 bankruptcy petition, Manfredi reported monthly
income of $1,750 from employment and $3,350 from family
assistance.  (2005 Bankr. Pet. at 17.)  Each of these statements
is clearly inconsistent with the 2004 tax return indicating
Manfredi earned $8,000 per month.  Absent persuasive evidence
indicating the government prosecuted the case for reasons other

---

[7]     The government objects to the declaration of Donald
Vilfer, stating an analysis of Manfredi's bank records in the
government's possession indicated an average monthly income of
$8,000.  The government argues Vilfer's analysis is based on
insufficient facts or data and undisclosed methodology, among
other things.  Therefore, the government moves to strike Vilfer's
declaration.  The court declines to rule on the government's
motion to strike because even considering this evidence, it fails
to prove the government's case was frivolous, vexatious, or in
bad faith.  Indeed, if the bank statements indicate Manfredi had
a monthly income of $8,000 per month, it at least serves to
establish Manfredi's statement in the 2004 bankruptcy petition of
a $6,000 monthly income was false.

than the above inconsistencies and those discussed in relation to defendant's argument that the government's case was frivolous, Manfredi cannot meet his burden of showing bad faith.

The court once again notes that the government's handling of this case was unorthodox, particularly the continued discovery *after* the commencement of trial (apparently pursuant to an agreement between the parties) and prosecutor Endrizzi's interactions with Macaluso.  However, such conduct simply does not rise to the level of a conscious pursuit of the case based on dishonest purposes or moral obliquity.  See Schneider, 395 F.3d at 88 (concluding government's threat during proffer session to prosecute defendant if he invoked his Fifth Amendment rights was "merely evidence of vigorous negotiating by the government, rather than personal animus or dishonesty").  Thus, the court does not award attorney's fees on this basis.

### CONCLUSION

For the foregoing reasons, defendant's motion for attorney's fees is DENIED.

IT IS SO ORDERED

DATED: March 11, 2008.

_____
FRANK C. DAMRELL, Jr.
UNITED STATES DISTRICT JUDGE

24